**In the United States District Court
for the District of Kansas**

———————

Case No. 24-cr-40071-TC-1

———————

UNITED STATES OF AMERICA,

*Plaintiff*

v.

DA'VEON M. COOK,

*Defendant*

———————

**MEMORANDUM AND ORDER**

    A grand jury indicted Da'Veon M. Cook on one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). Doc. 23. Cook now moves to suppress statements he made to law enforcement and evidence obtained during a search of his DNA. Docs. 15 & 16. For the following reasons, Cook's motions are denied.

**I**

**A**

    Cook makes two separate requests. One concerns the constitutionality of questions that officers asked him before informing him of his right to remain silent. Doc. 15.[1] The other concerns the propriety of obtaining a warrant from a state judge. Doc. 16. Each has its own standard.

    **1.** Cook first seeks to suppress incriminating statements he made to law enforcement officers at the scene of his arrest before officers advised him of his rights. Doc. 15. The Fifth Amendment's Self-

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. It prohibits the Government from bringing its power to bear on individuals such that they are compelled to make incriminating, testimonial statements about themselves. *See Fisher v. United States*, 425 U.S. 391, 408 (1976).

The Supreme Court construed this provision to require law enforcement officers to prophylactically inform a suspect of his or her rights, including the right to remain silent and the concomitant warning that anything said may be used against the suspect in court, before conducting a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)*; accord United States v. Guillen*, 995 F.3d 1095, 1108–09 (10th Cir. 2021). That holding has been criticized as extending the Fifth Amendment beyond its text and providing "a remedy even to the defendant who has suffered no identifiable constitutional harm." *Dickerson v. United States*, 530 U.S. 428, 453 (2000) (Scalia, J., dissenting) (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)). That is because the rule is a procedural safeguard designed to "assure that the individual is accorded his privilege under the Fifth Amendment," *Miranda*, 384 U.S. at 439, yet "it is easy to imagine many situations in which an un-*Mirandized* suspect in custody may make self-incriminating statements without any hint of compulsion," *Vega v. Tekoh*, 597 U.S. 134, 142 (2022). As a result, it may lead to "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment" being excluded under *Miranda's* rule. *Elstad*, 530 U.S. at 307.

Nonetheless, if law enforcement uses custodial interrogation to elicit an incriminating statement without first properly warning the suspect, the ordinary rule is that the statement(s) cannot be used in the Government's case-in-chief in a criminal trial. *Miranda*, 384 U.S. at 479; *United States v. Wagner*, 951 F.3d 1232, 1249–50 (10th Cir. 2020). A defendant bears the initial burden to prove that the Government's conduct implicated his or her Fifth Amendment rights. *See United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020); *United States v. Ringold*, 335 F.3d 1168, 1171 (10th Cir. 2003). The Government may then show that the defendant made the incriminating statements in a situation that meets an exception to *Miranda's* requirements to avoid suppression. *United States v. DeJear*, 552 F.3d 1196, 1201–02 (10th Cir. 2009).

**2.** Cook also seeks to suppress evidence obtained during a search of his DNA because, in his view, the search violated Federal Rule of Criminal Procedure 41. Doc. 16. Rule 41 establishes where and how to

apply for a warrant that is federal in character. *United States v. Krueger*, 809 F.3d 1109, 1112 (10th Cir. 2015). Rule 41(b)(1) requires that the officer seeking a warrant apply to a federal "magistrate judge with authority in the district" where property or persons to be searched or seized is located "or if none is reasonably available," a state court judge in the district. Where Rule 41(b)(1) is violated, suppression is warranted only if the rule violation was intentional, prejudicial, or of "constitutional magnitude." *Krueger,* 809 F.3d at 1113–14.

Rule 41(b)(1) is not implicated when a search warrant is of state, rather than federal, character. A search warrant retains its state character when it was requested by a state law enforcement officer, was issued by a state judge, its execution was planned and carried out by state officers, and there is no evidence that a federal prosecution was envisioned at the time of the search. *United States v. Sadlowski*, 948 F.3d 1200, 1204 (10th Cir. 2020) (citing *United States v. Barrett*, 496 F.3d 1079, 1090–91 (10th Cir. 2007)).

### B

**1.** On July 9, 2024, two United States Probation Officers, Zachary Burgoon and Valerie Allen, conducted an unannounced visit upon the residence of Da'Veon M. Cook.[2] At the time, Cook was serving a 24-month term of supervised release for a prior federal conviction. *See* Judgment, *United States v. Cook*, No. 21-40025 (D. Kan. June 15, 2022), Doc. 44. Burgoon and Allen were visiting Cook's residence as part of a routine home contact, which Allen testified is a typical practice that probation officers do to check in with an individual under supervision.

Cook lived in a large apartment complex in Topeka, Kansas with eight to ten separate buildings, each containing several individual apartment units. When the officers arrived, they parked at a gas station across the street from the complex to observe the surroundings and ensure their safety. They saw Cook leave his apartment unit wearing a long-sleeve jacket, which the officers found suspicious on a hot July afternoon. An unknown individual accompanied Cook. After the pair left the apartment unit, the unknown individual walked toward the gas station, but Cook went back inside. Soon after, Cook exited the unit

---

[2] The following facts were found based on the witnesses' testimony at the suppression hearing.

3

again, and the other individual turned around and walked toward Cook.

Burgoon and Allen decided to alert Cook to their presence. Allen walked toward the apartment complex, calling out Cook's name. Cook turned around, saw Allen, hesitated, and then hid behind a vehicle in the parking lot. Behind the vehicle, Allen saw Cook doing something with his hands but could not tell what was happening. She commanded Cook to show his hands and to come out from behind the vehicle. Cook started to run away. Allen and Burgoon gave chase, as Cook ran to several different places within the complex, including a full circle around the building that housed his individual unit. During the pursuit, Allen observed a firearm in Cook's right hand. At one point, Cook hid behind a bush near his apartment building while officers commanded him to come out and show his hands.

Instead of complying, Cook continued to run, this time heading toward a tree line near the complex. As he ran across the parking lot, Burgoon saw Cook drop a magazine. Cook ran into the wooded area surrounded by the tree line, causing the officers to lose sight of him. Allen called 911 to request additional assistance from law enforcement.

Over fifteen minutes later, Cook emerged from the wooded area. Believing that Cook was still armed, Allen ordered Cook to show his hands and get on the ground. Cook resisted and began walking toward a nearby open field next to a car wash. He showed his hands, but he continued to walk away. Once Cook arrived at the open field, he finally complied with the officers' requests and got on the ground. By that point, officers with the Topeka Police Department had arrived to assist.

The comments Cook takes issue with were made at the scene of his arrest. While Burgoon and Allen handcuffed Cook, Allen asked, "Where'd you put the gun? Now's not the time to lie, Da'Veon." Cook responded, "I don't have one." The officers finished handcuffing and detaining Cook and took him to one of the police vehicles so he could be transported from the scene. Outside the vehicle, Officer John Hanson with the Topeka Police Department asked Cook, "Where's the gun?" Cook replied, "I don't have no gun, bro." Hanson then said, "Yes, you did," to which Cook responded, "If I did, that shit is long gone." Hanson told Cook, "You think it's long gone 'til a kid finds it." And finally, Cook stated, "Nobody's gonna find it. I don't even know what you're talking about."

4

After Topeka police took custody of and transported Cook from the scene, additional Topeka officers unsuccessfully searched for the firearm for over thirty minutes. They primarily focused on the wooded area where Cook had been hiding for over fifteen minutes, including the use of a canine to help locate the firearm. Despite those efforts, they were unable to locate it. Two days later, however, Topeka officers were notified that the apartment's groundskeeping crew found a firearm near brush between two of the buildings at the complex. A Topeka officer went to the complex, met with the apartment managers, and recovered a firearm.

**2.** On July 11, 2024, a Topeka police officer contacted Officer Nicole Karr about the firearm recovered at Cook's apartment complex. Karr is employed by the Topeka Police Department, where she primarily investigates crimes involving firearms. She also has federal law-enforcement responsibilities because she is cross-deputized as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Because she has mixed responsibilities, Karr works on both federal and state cases. If her investigation supports a state prosecution, she attempts to make the best state case she can to present to the state district attorney. As a general rule, Karr suggested that local prosecutors exercise a right of first refusal for any prosecutions before they would be offered to federal officials.

Karr began her investigation. At first, she was only informed that Topeka officers received the firearm and that it had been swabbed for DNA collection. She was later informed that Cook was involved in the incident, so, consistent with her typical practice, her first step was to determine whether Cook was prohibited from possessing a firearm. Karr knew that Cook was under federal supervision in some capacity because probation officers were at the scene, so she asked Allen to share her report. Karr also searched the state database systems that she typically uses to see whether Cook had been convicted of any state offenses prohibiting him from possessing a firearm. Those databases only include state offenses—not federal ones. Her investigation revealed that Cook carried a conviction under Kansas law that prohibited him from possessing a firearm. At that point, Karr believed that the facts supported all the elements of a state law crime.

Karr's next step was to draft a charging affidavit. She included the facts of the case that she had learned from Allen's report and allegations that Cook had violated state law. She presented it to a state judge in support of her application for a search warrant to collect Cook's

DNA through a buccal swab. The judge approved that warrant, so Karr collected Cook's DNA on July 17, 2024, and placed it in the custody of the Topeka Police Department. The Kansas Bureau of Investigation conducted forensic testing on Cook's DNA and concluded that it was consistent with the DNA profile on the firearm found at Cook's apartment complex.

**3.** The State did not ultimately prosecute Cook for the violations alleged in Karr's affidavit. But federal prosecutors did, and on December 4, 2024, a grand jury indicted Cook on one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). Doc. 1.

Cook now moves to suppress the statements he made to Allen and Hanson in response to questions they asked him about the firearm's location before they advised him of his rights. Doc. 15. In addition, he moves to suppress his DNA evidence and any fruits of that evidence, arguing that Karr violated Federal Rule of Criminal Procedure 41 by requesting a search warrant in state rather than federal court. Doc. 16. The Government opposes both arguments. Docs. 17 & 19. These arguments were fully addressed at an evidentiary hearing on May 28, 2025. Doc. 27.

## II

Cook is not entitled to suppression. The officers were not required to inform him of his rights before asking him where the firearm was located under the public-safety exception to *Miranda*. And even if the state search warrant violated Rule 41, that violation was not intentional, prejudicial, or of constitutional magnitude. Accordingly, Cook's motions are denied.

### A

Cook first seeks to suppress statements he made to law enforcement while or immediately after they arrested him. Doc. 15. In particular, he seeks to suppress the statement, "I don't have one," which he made in response to Allen's question, "Where'd you put the gun?" He also seeks to suppress the statements he made in response to Hanson's questions about the firearm, including "I don't have no gun bro," "if I did, that shit is long gone," and "nobody's gonna find it. I don't even know what you're talking about." The Government concedes that a custodial interrogation occurred, Doc. 17 at 5, so the sole question is

whether the public-safety exception made it unnecessary for officers to inform Cook of his rights before they asked him questions about the firearm.

In *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court created an exception to the general rule requiring law enforcement officers to inform a suspect of his or her rights before a custodial interrogation. The public-safety exception allows a law enforcement officer to interrogate an individual in custody before reading the suspect his or her rights where "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Quarles*, 467 U.S. at 657.

The Tenth Circuit applies a two-step inquiry to determine if the public-safety exception applies. *United States v. DeJear*, 552 F.3d 1196, 1201–02 (10th Cir. 2009). It first considers whether the officer asking questions had reason to believe "that the defendant might have (or recently have had) a weapon." *Id.* It then asks whether the officer had an objectively reasonable belief "that someone other than police might gain access to that weapon and inflict harm with it." *Id.* at 1201–02. If the Government satisfies this standard, then the evidence need not be suppressed because the rule announced in *Miranda* does not apply. *Id.*

The circumstances surrounding Cook's arrest satisfy both elements of the public-safety exception. First, the officers at the scene reasonably believed that Cook was recently carrying a weapon. At the beginning of the pursuit, when Cook was hiding behind a vehicle, Allen saw him doing something with his hands behind the car that made her suspect he had a firearm. *See DeJear*, 552 F.3d at 1202 (finding the public-safety exception satisfied where the defendant was seen stuffing something into the seat of the car and had twice refused to show his hands). That suspicion was then confirmed when Allen saw a firearm in Cook's right hand while he was running away from her. *See Quarles*, 467 U.S. at 657 (finding that the public-safety exception applied where police officers believed the suspect had just removed a firearm from his empty holster and discarded it).

Second, the officers reasonably believed that someone else—in particular, a child—would find the firearm and inflict harm with it. *See United States v. Donachy*, 118 F. App'x 424, 426–27 (10th Cir. 2004) (finding that the public-safety exception applied where officers thought that a missing gun remained an ongoing threat in a

7

neighborhood with many pedestrians and children). In fact, Hanson, one of the officers who asked Cook about the firearm's location, contemporaneously and expressly told Cook that he worried a child would find the gun. Doc. 17 at 4 ("[Y]ou think it's long gone 'til a kid finds it."); *see United States v. Lackey*, 334 F.3d 1224, 1227–28 (10th Cir. 2003) (explaining that the public-safety exception applies where the officers' questions are intended to address officers' concerns of danger to themselves or the public).

The evidence adduced at the suppression hearing confirms that Hanson's concern was objectively reasonable. Hanson regularly patrols the area where Cook lived and explained that the area is full of businesses and people, including families with children. In fact, the officers observed how populated the area was on the day of Cook's arrest because several individuals came out of their residences to watch what was happening and ask the officers about their safety.

Cook's arguments to the contrary do not change this result. He first argues that the public-safety exception does not apply because the area in which he hid the firearm was "within an inhospitably overgrown area of dense vegetation in the suburban outskirts of Topeka." Doc. 22 at 3–4. This is different, according to Cook, than typical cases where the public-safety exception applies, which involve "densely populated urban area[s] frequented by adults and children alike." *Id.* at 3. Not so. As previously described, the area where Cook's arrest occurred was frequented by adults and children alike—many of whom officers observed during the incident in question. And the firearm was found not in the allegedly inhospitable wooded area where Cook hid for a portion of his attempt to escape, but rather within that populated area where officers knew citizens, including children, to frequent. In fact, it was found between apartment buildings in or around brush, a place where somebody could easily have found it and used it to inflict harm. *See Donachy*, 118 F. App'x at 427 ("If the gun was discarded in a public place, it posed a continuing immediate danger because anyone could have found the gun at any time . . . and the danger posed by the gun does not dissipate over time." (quoting *Allen v. Roe*, 305 F.3d 1046, 1051 (9th Cir. 2002))).

Cook's second argument also lacks merit. He says that the officers knew (or should have known) that the firearm was not loaded because one of them saw a magazine fall to the ground while Cook was running away. Doc. 22 at 3. But the fact that Cook dropped a magazine does not make it any less reasonable for the officers to believe that he had

8

a weapon, that it might be loaded (e.g., with a round remaining in the chamber or with another magazine), or that someone else might find it and use it to inflict harm.

Cook's final argument also fails to persuade. He asserts that "[u]nder the rule of party presentation, this Court should refrain from attempting to independently locate a case that might carry this burden on the government's behalf." Doc. 22 at 2 n.6. That rule affords Cook no refuge. Generally speaking, it counsels against deciding legal questions that the parties did not raise, but it does not preclude relying on cases that a party did not identify. *See United States v. Perez*, 127 F.4th 146, 166 (10th Cir. 2025) (explaining that the party-presentation principle is not violated when a court "rules on a properly raised issue but does not render its decision in accordance with the position of one of the parties" (internal citation omitted)). That concern is absent in this case because the Government asserted that the *Quarles* public-safety exception to *Miranda* applies, and it cited legal authority to support its position. Doc. 17 at 4–6. It does not violate the rule of party presentation to identify binding authority, determine the appropriate conclusion to the issues raised by the parties, and reference the cases that led to that result. *See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 56 (2006) (explaining that courts must independently analyze the legal question raised even if it is a different interpretation than the parties offered).

**B**

Cook also seeks to suppress the evidence that Officer Karr collected during a search of his DNA.[3] Doc. 16. He argues that the search warrant Karr obtained was federal in character, so it should have been approved by a federal magistrate judge rather than a state judge. *Id.* at 4–7.

Karr has both federal and state law enforcement responsibilities. There is no controlling precedent clarifying what effect, if any, an

---

[3] Cook requests judicial notice of documents he used to cross-examine Karr in an evidentiary hearing. Doc. 29. Those documents contained information regarding search warrants Karr had sought in cases where she applied for a warrant in federal court. That unopposed motion is granted. *See Johnson v. Spencer*, 950 F.3d 680, 711 (10th Cir. 2020) (explaining that district courts may take judicial notice of their own records).

officer's cross-deputization may have on whether a search was federal in character where that officer is the only agent participating in a search or investigation. Tenth Circuit precedent does suggest, however, that an investigation should not be classified as federal in character simply because a federal officer had some involvement in the investigation or the search. *United States v. Barrett*, 496 F.3d 1079, 1090–91 (10th Cir. 2007). Instead, an investigation or search involving both federal and state elements should be classified as primarily federal or state in character. *See, e.g.*, *id.* And if an investigation is primarily state in character, it need not comply with Rule 41.

Karr was cross-deputized, and federal probation officers initiated the interaction with Cook. But the facts of this case suggest that Karr's interest was primarily a state-law investigation at the time Karr applied for a warrant to conduct a search of Cook's DNA. Karr was contacted regarding the firearm in this case by state officers, she prepared an affidavit for what she envisioned would be a state prosecution, and she believed she was acting in a state capacity when she conducted the search of Cook's DNA. Consistent with her typical practice, Karr drafted her affidavit in way that would support the best state case possible. Karr believed there was a strong case that Cook committed two state offenses: possessing a firearm as a convicted felon in violation of K.S.A. § 21-6304, and possessing stolen property in violation of K.S.A. § 21-5801. Karr exclusively envisioned a state prosecution based on her understanding that the state had the first right of refusal in its decision whether to prosecute Cook for possessing a firearm as a convicted felon. There are elements of a federal felon-in-possession charge, 18 U.S.C. § 922(g)(1), that do not appear in its state-law counterpart—elements that Karr testified she did not consider when she applied for the warrant in state court because she was not anticipating a federal case. *See generally Gamble v. United States*, 587 U.S. 678, 683–84 (2019) (reaffirming that the dual-sovereignty doctrine, which permits two prosecutions for conduct that violates both federal and state law, does not violate the Double Jeopardy clause).

Karr was the only officer involved in applying for a search warrant to collect Cook's DNA. And she was the only officer who conducted that search. Neither the information Karr received from federal probation officers nor the fact that she has some federal duties suffices to characterize Karr's search as federal in character. *See United States v. Barrett*, 496 F.3d 1079, 1090–91 (10th Cir. 2007) (explaining that some federal involvement in an investigation does not make it federal in

character if a federal prosecution was not envisioned at the time of the search). Because Karr's investigation was of state character, it did not implicate Rule 41.

Yet even assuming Karr violated Rule 41, suppression would be unwarranted. Cook does not assert that the alleged violation was prejudicial or constitutional, so the only question is whether it was intentional and deliberate. *See Sadlowski*, 948 F.3d at 1204 (only analyzing the prong that the defendant invoked). Cook argues Karr intentionally violated the rule when she applied for a warrant in state court because Karr was on notice of Rule 41 and Tenth Circuit precedent. Doc. 16 at 7.

The evidence Cook champions actually undermines his position. True, Karr testified that she knew Rule 41 required her to seek a search warrant from a federal magistrate judge when a search is federal in character. Indeed, she had complied with that rule in prior cases because, in those cases, she knew from the outset that a federal prosecution would ensue. That she chose not to do so here supports her testimony that she only anticipated a state prosecution. There is nothing in the record or based on the testimony that would suggest Karr intentionally or deliberately sought to avoid a federal magistrate, there is no binding authority regarding the protocols cross-designated officers must follow when the defendant faces criminal liability under both sovereign's laws, and there is no indication that Karr acted in bad faith. *See United States v. Krueger*, 809 F.3d 1109, 1115 (10th Cir. 2015) (indicating that an intentional Rule 41 violation requires that the officer acted in bad faith). That a federal prosecution later occurred (in December)—based on decisions made among state and federal prosecutors—does not change what Karr expected when she wrote her affidavit (in May). And, in any event, there is no indication that a federal magistrate judge would not have approved a search warrant for Karr to collect Cook's DNA had she filed her affidavit in federal court instead. That would have led Karr to the same incriminating evidence: Cook's DNA matching that found on the firearm that officers recovered from his apartment complex. *See Krueger*, 809 F.3d at 1116–17 (explaining that seeking a warrant from a state judge or a judge in the wrong district only prejudices a defendant when the search would not have occurred absent the Rule 41 violation).

## III

For the foregoing reasons, Cook's Motions to Suppress, Docs. 15 and 16, are DENIED, and his Motion for Judicial Notice, Doc. 29, is GRANTED.

It is so ordered.

Date: June 23, 2025                     s/ Toby Crouse
                                        Toby Crouse
                                        United States District Judge